IN THE UNITED STATES DISTRICT COURT OF
THE MIDDLE DISTRICT OF FLORIDA
(ORLANDO DIVISION)

WESTGATE RESORTS, LTD., et al,   CASE NO.: 6:19-cv-01982-PGB-GJK

    Plaintiffs,

vs.

WESLEY FINANCIAL GROUP, LLC, a Tennessee limited liability company,

    Defendants.

_____/

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR PROTECTIVE ORDER AS TO PLAINTIFFS' SUBPOENA DUCES TECUM TO BETTER BUSINESS BUREAU, INC.

Plaintiffs Westgate Resorts, Ltd. *et al.* (collectively "Westgate") oppose Defendant's Motion for Protective Order as to Plaintiffs' Subpoena Duces Tecum to Defendant's local Nashville, Tennessee Better Business Bureau, Inc. (Doc. 43).

## INTRODUCTION

Wesley Financial Group, Inc. is a bad company. Not because Westgate says it, but because that is what Defendant's local Nashville, Tennessee Better Business Bureau ("BBB") decided on November 20, 2019 when it revoked Defendant's accreditation.

**ADDITIONAL BUSINESS INFORMATION**

**Additional Information:** On November 20, 2019 BBB's Board of Directors voted to revoke the accreditation of this business for failure to uphold BBB's Standard of Build Trust and Embody Integrity.

*See* Wesley Financial Group, LLL profile at https://www.bbb.org/us/tn/franklin/profile/timeshare-advocates/wesley-financial-group-llc-0573-37070239 (last viewed on May 20, 2020).

Westgate has alleged that Defendant falsely advertises its services to every timeshare

owner, not just to Westgate owners.  And Westgate has alleged that Defendant's business practices are unfair and deceptive to every timeshare owner unfortunate enough to contract with Defendant, not just Westgate owners. Reading Defendant's motion one would believe Defendant advertises differently – uniquely – to Westgate owners than it does to every other timeshare owner within range of Defendant's saturation advertising and social media inundation. ***But that would be false***. Defendant's advertising is ubiquitous; there is no difference in what a Westgate owner sees or hears from what a Wyndham, Bluegreen or Diamond Resorts™ owner sees or hears.

And one would believe that Defendant's "cancellation" methods for Westgate owners are different – unique – from the methods Defendant employs for every Wyndham, Bluegreen and Diamond Resorts™ owner and for every owner of every other timeshare developer whoever the developer may be*.  **And that too would be false.*** Defendant is a one-trick pony; it has a cookie-cutter set of forms it dispenses to every customer, regardless of developer, who Defendant then obliges to lie to every timeshare developer so that Defendant remains in the dark crevices of secrecy.

While Westgate companies are plaintiffs here, Defendant's relevant conduct is in no way limited to or targeted to Westgate.  Defendant simply cannot do that; it says and does the same things to owners of every timeshare developer who are exposed to or respond to Defendants' advertising.   So relevance – the central theme of Defendant's Motion – cannot be compartmentalize by saying "Westgate is the Plaintiff" and all discovery in this case is "only Westgate".  It is not possible for Defendant or this Court - or the Nashville Tennessee BBB - to differentiate, and it certainly would ignore undisputed facts.  And, most importantly, ***Defendant cannot deny any of this.***

BBB customer complaints are published online; they are not confidential and more importantly they are not Defendant's records. Defendant's customers – owners of all varieties of

timeshare, not just Westgate – claim, among other things, that Defendant charged for services it did not provide, refused to return payments despite the money back guarantee, was predatory and non-transparent, put the customer in financial trouble, and more. *See* Wesley Financial Group, LLC Complaints at https://www.bbb.org/us/tn/franklin/profile/timeshare-advocates/wesley-financial-group-llc-0573-37070239/complaints (last viewed on May 20, 2020). Yet, Defendant continues to advertise to owners of every timeshare developer, not just Westgate, its success as a timeshare exit company with a 100% money back guarantee, one of the things this lawsuit is about. Its advertising touts stellar customer reviews from owners of every timeshare developer, not just Westgate, and previously boasted its BBB accreditation. Westgate is entitled to discovery from all of Defendant's customers who reported their experiences with Defendant to the BBB regardless of the timeshare developer to which they are associated because Defendant does not discriminate amongst timeshare developers; Defendant says and does the very same thing to each of them regardless of developer. Any complaint or review regarding aspects of Defendant's business are relevant to its claims in advertising and to the business practices at issue because all of the advertising and business practices are the same regardless of developer.

The trial in this case will be about the truth or falsity of Defendant's advertising and the illegitimacy of its business practices. Every customer who testifies about the falsity of the Defendant's advertising or about Defendant's ersatz "cancellation" process provides evidence directly relevant to the claims – and defenses – in this case regardless of whether they are a Westgate owner.

Defendant has resisted every single discovery request Westgate has made. Here, with the Nashville Tennessee BBB, these are not even Defendant's documents. These are not confidential documents. These documents identify people – witnesses – who will likely say bad things about Defendant. So of course Defendant stonewalls this discovery with, when scrutinized, absurd

objections, akin, for instance to saying that a list of *Westgate's* owners is, somehow, Defendant's confidential attorneys' eyes only document

Defendant operates under a veil of secrecy and contractually, under penalty of forfeiture, requires every owner – not just Westgate owners – to lie to the timeshare developer about hiring Defendant. This is the only way Defendant operates; it does not and cannot distinguish between Westgate owners and owners of other timeshare developers. So witnesses to Defendant's advertising, witnesses to Defendants business practices will all provide relevant evidence because of the way ***Defendant*** has chosen to advertise and conduct its business. Defendant's business model does not make Westgate any more or less relevant than Wyndham, Bluegreen or Diamond Resorts™. It treats them all the same. So Defendant itself has made Wyndham owners, Bluegreen owners, Diamond Resorts™ owners and owners of every other timeshare developer just as relevant as Westgate owners. Accusing Westgate of exceeding the bounds of relevancy is simply dishonest. Defendant and its chosen advertising and business model made everything it does to everyone it does it to relevant to this case long before Westgate sued Defendant.

## MEMORANDUM OF LAW

**I.   STATEMENT OF RELEVANT FACTS AND PROCEDURAL HISTORY**

Defendant's Motion for Protective Order begins by quoting this Court completely out of context. Defendant says, without providing crucial context, that the "Court rejected a prior effort to obtain discovery regarding other timeshare companies' customers." (Doc. 43, p. 2). Defendant's counsel provided, at the hearing, the context he now ignores: "jurisdictional discovery is sort of a different animal from merits discovery." *See* Hrg. Trans. at 31:15. The Court agreed, while reaffirming that its ruling does not apply to merits discovery: "this has nothing to do with merits discovery." *Id.* at 63:21-22. The subpoena to the Nashville Tennessee BBB is merits discovery; no more need be said.

4

**Defendant's Advertisements**

Defendant's website landing page opens with: "GUARANTEED TIMESHARE CANCELLATION." *See* https://timesharecancellations.com/ (last viewed on May 20, 2020). It goes on: "Best customer service out there!!" *Id.* And on: "we know how to get out of a timeshare successfully which in turn gives you peach of mind." *Id.* Defendant dedicates a page to client testimonials, inviting visitors to "Hear more from our satisfied clients." *See* https://timesharecancellations.com/testimonials/ (last viewed on May 20, 2020). Unsurprisingly none of the twenty-five video testimonials and one written testimonial say one bad word about Defendant. This makes the counter-narrative which indisputably exists, starting with what customers have reported to the BBB – which, remember, precipitated the revocation of accreditation – automatically relevant. ***Defendant*** not Westgate chose to populate its webpages with these testimonials. ***Defendant*** not Westgate made what the customers Defendant defrauded relevant. And a number of those customers reported to the BBB.

**The BBB**

The subpoena is directed to the Nashville Tennessee Better Business Bureau, in Defendant's area. Defendant has nothing to do with this subpoena; it need produce nothing. The reason for the subpoena is obvious:

> BBBs work for a trustworthy marketplace by maintaining standard for truthful advertising, investigating and exposing fraud against consumers and businesses, and providing information to customers before they purchase products or services.

*See* Better Business Bureau, Frequently Asked Questions, https://www.bbb.org/frequently-asked-questions (last viewed May 13, 2020).

The BBB involves itself in customer complaints: "BBB handles disputes that relate to marketplace issues experienced with the services or products a business provides." *Id.* Complaints

and responses are published online, sometimes with redactions for personal information only. The BBB's current profile for Defendant shows customer complaints going back three years. Defendant, of course, does not want Westgate to know who these potential witnesses or who complained four or five years ago.

BBB customer complaints are public; there is no possibly confidentiality. A consumer who files a complaint "**wants to share the outcome with the public**." Likewise, the BBB's customer review function allows consumers to share their opinion with "**the public**" – good or bad. *Id.* (emphasis added). Customer reviews are published online, often with redactions for personal information. Defendant, again, does not want Westgate to identify these potential witnesses or those who gave a good or bad review four or five years ago.

BBB explains its accreditation: "BBB Accreditation signifies trust and integrity, and an unwavering commitment to consumers." *See* Better Business Bureau Website, https://www.bbb.org/ (Last viewed on May 13, 2020). "If a business has been accredited by the BBB, it means BBB has determined that the business meets accreditation standards, which include a commitment to make a good faith effort to resolve any consumer complaints." *See* Better Business Bureau, Apply for Accreditation Now, https://www.bbb.org/become-accredited (Last viewed on May 13, 2020). A company must meet the BBB's standards for "sound advertising, selling and customer service practices that enhance customer trust and confidence in business:"

> 1. Build Trust
> Establish and maintain a positive track record in the marketplace.
>
> 2. *Advertise Honestly*
> *Adhere to established standards of advertising and selling*.
>
> 3. *Tell the Truth*
> *Honestly represent products and services, including clear and adequate disclosures of all material terms.*

> 4. Be Transparent
>
> Openly identify the nature, location, and ownership of the business, and clearly disclose all policies, guarantees and procedures that bear on a customer's decision to buy.
>
> 5. *Honor Promises*
>
> *Abide by all written agreements and verbal representations*.
>
> 6. Be Responsive
>
> Address marketplace disputes quickly, professionally, and in good faith.
>
> 7. Safeguard Privacy
>
> Protect any data collected against mishandling and fraud, collect personal information only as needed, and respect the preferences of customers regarding the use of their information.
>
> 8. *Embody Integrity*
>
> *Approach all business dealings, marketplace transactions and commitments with integrity*.

*See* Better Business Bureau Website, BBB Accreditation Standards, https://www.bbb.org/bbb-accreditation-standards (last viewed on May 13, 2020)(*e.s.*). BBB accredited Defendant. Then, when it scrutinized Defendant through the filter of its Accreditation Standards, BBB revoked that accreditation. No less than four of the BBB's accreditation standards – the ones highlighted above – are elements of Westgate's false advertising and unfair and deceptive acts claims. Data, customer statements, documents upon which BBB relied proving an element of Westgate's claims is relevant, whether the data, consumer or document says "Westgate" on it.

The BBB has information and documents that can prove one or more of Westgate's claims. The BBB has names of likely witnesses. That makes the discovery sought from the BBB automatically relevant.

## II.   APPLICABLE LEGAL STANDARDS AND PROCEDURES:

The scope of allowable discovery pursuant to Rule 26 of the Federal Rules of Civil Procedure is broad.  "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense…" Fed. R. Civ. P. 26(b)(1).  The term relevant is to be "'construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that bears on, any issue that is or may be in the case.'"  *Cornett v. Lender Processing Services, Inc.*, 2012 WL 5305990, at *2 (M.D. Fla., October 29, 2012) (citing *Auto--Owners Ins. Co. v. Southeast Floating Docks, Inc.*, 231 F.R.D. 426, 430 (M.D. Fla. 2005)).  "Consistently with the notice-pleading system established by the Rules, discovery is not limited to issues raised by the pleadings, for discovery itself is designed to help define and clarify the issues. Nor is discovery limited to the merits of a case, for a variety of fact-oriented issues may arise during litigation that are not related to the merits." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).

Rule 26(c) further provides that a court may issue a protective order when a movant demonstrates good cause for issuance of an order protecting "a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c).  To demonstrate good cause, the movant has the burden of showing "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements" of a need for issuance of a protective order.  *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 n. 16 (1981).  Thus, the party seeking to oppose discovery bears the burden to show that the discovery is improper.  *See, e.g., Panola Land Buyers Ass'n v. Shuman*, 762 F.3d 1550, 1559 (11th Cir. 1985); *Stem v. O'Quinn*, - F.R.D. -, 2008 WL 4555335 *6 (S.D. Fla. Aug. 29, 2008).  In addition, courts have recognized that "[b]road allegations of harm, unsubstantiated by specific examples of articulated reasoning, do not satisfy the Rule 26(c) test." *Trinos v. Quality Staffing Servs. Corp.*, 250 F.R.D. 696, 698 (S.D. Fla. July 7, 2008). "To sustain a discovery objection, the party opposing production–Defendant, in this

8

case–has the burden of showing that the requested discovery has no possible bearing on the claims and defenses raised in the case." *Osborne v. Gila, LLC*, No. 15-62585-CV, No. 2016 WL 7508260, at *1 (S.D. Fla. May 24, 2016) (citing *Wrangen v. Pennsylvania Lumbermans Mut. Ins. Co.*, 593 F. Supp. 2d 1273, 1278 (S.D. Fla. 2008)).

### III.   ARGUMENT

#### A. Defendant Should Not Be Allowed to Benefit From Its Deceptive Practices By Limiting Discovery Only to Its *Known* Activities.

Defendant has not read Westgate's complaint. Defendant says Westgate asserts a "discrete series of unfair marketing and trade practices." That is not correct. Westgate specifically identifies the *known* unfair and deceptive trade practices it has uncovered. But central to this case is that Defendant shrouds its business practices in secrecy, stymying Westgate presuit efforts and explaining Westgate's current dependence on discovery. To be clear, **Defendant** not Westgate created this veil of secrecy. Its choice of business practices – dictated by no-one other than Defendant – created the need and justification for the discovery currently sought.

Out of habit – *i.e.* the personal jurisdiction discovery – Defendant unilaterally narrows the scope and claims in the Complaint. Defendant knows that the claims in this case are not limited to what is described in the Complaint:

> This enumeration is not intended to be exhaustive and additional false and misleading statements and deceptive acts and practices which Westgate will include in this claim and for which Westgate will seek relief herein are expected to be identified by continuing investigation and through discovery.

Compl. at ¶¶ 63 and 81. Indeed, this is the purpose of discovery. *See Oppenheimer Fund, Inc.*, 437 U.S at 351 ("discovery is not limited to issues raised by the pleadings…."). Here, the need for discovery is manifest. Defendant shrouds its business practices in secrecy; there is no other way to pierce the veil.

9

The Complaint makes clear *the starting point* of this case:

- Defendant makes promises that are either "false, meaningless, or both, and in the end the customer is left in a worse position than when they started." ¶ 3.

- "Wesley makes false and misleading promises with a "100% guarantee" that Wesley can legally relieve timeshare owners of their obligations, including owners of Westgate timeshare interests." ¶ 4.

- "Wesley engages in an elaborate misdirection designed to convince the client that it is searching for grounds that would support a 'legal' cancellation of the timeshare interest, while knowing that no such avenue truly exists." *Id.*

- "Wesley solicits Westgate owners, many of whom reside in Florida and/or whose timeshare interests are located in Florida, through the use of false, misleading, and deceptive advertising." ¶ 26.

- "Wesley is engaged in a timeshare cancellation scheme with no legitimate legal foundation designed to induce existing Westgate owners to breach their Purchase Agreements with, and related obligations to, Westgate in order to steer Westgate owners to instead pay large, upfront sums to Wesley for its pecuniary gain." ¶ 36.

- "Wesley's scheme is implemented by luring unwitting Westgate owners to hire Wesley through false and misleading marketing…" ¶ 37.

- Defendant's website states, "we know how to get you out of a timeshare successfully." *Id.*

- "Wesley does not have any cognizable method of actually accomplishing what Wesley promises." *Id.*

- "Wesley tells its prospective customers that if they are accepted as a claim, they 'will never be required to make another payment on [their] timeshare; [their] clients experience an immediate freedom.'" ¶ 38.

- Advertisements on Wesley's website say that Wesley "know(s) how to get out of a timeshare successfully," and that Wesley "guarantees that those people who are accepted as clients will have their timeshare terminated within the contractually agreed upon time period." ¶ 42.

- "Wesley offers misleading testimonials stating not only that its tactics will allow timeshare owners to legally cancel their contracts, but in many cases that Wesley has helped owners 'cancel your mortgage' or receive substantial refunds on payments that have already been made." ¶ 43.

- "Although neither McDowell nor the overwhelming majority of Wesley Financial employees who provide advice to clients are attorneys, McDowell repeatedly and falsely makes statements indicating that Wesley has legal expertise regarding the cancelation of timeshare contracts, stating in various online videos that 'you can legally

10

- get out of your timeshare', or offering testimonials proclaiming that Wesley 'know[s] all of the laws.'" ¶ 44.

- "Wesley misleads the owner into believing Wesley is gathering evidence to support a strategy that will allow the owner to legally cancel or terminate his or her timeshare interest, so that it appears that Wesley is earning its exorbitant fees." ¶ 47.

- "Wesley conceals its involvement by instructing the client to communicate directly with the timeshare company without ever revealing that the client is working with Wesley." ¶ 48.

- "Wesley's scheme is therefore designed to be executed through deceptive advertising followed by false promises of relief, deceptive communications with Westgate and false assurances to Westgate owners that they no longer owe any obligations to Westgate." ¶ 50.

- "Wesley willfully and deliberately makes false or misleading advertisements on its website, by television and radio, and through other means, such as unsolicited telephone calls, direct mail, and email, and falsely guarantees that it will legally relieve Westgate owners of their timeshare obligations if Wesley is retained." ¶ 59.

- "Wesley's conduct constitutes unconscionable commercial practices, deception, fraud, false pretenses, misrepresentation and the known concealment and misrepresentation of material facts, all in violation of FDUTPA." ¶ 83.

These wrongs in no way delimit Westgate's claims. These allegations alone are broad and encompass nearly every complaint a customer may have about Defendant's conduct. Even if a few one-off irrelevant complaints are captured in the documents from the BBB – completely speculative at this time – that does not justify requiring a non-party to audit its own document production. And it begs a further question, as this is a motion for protective order, what could any such "irrelevant" complaint *to the BBB* which by design is not confidential, say that would actually be prejudicial to Defendant, something that a protective order requires.

### B. Complaints and Reviews from Any Timeshare Owners Regarding Defendant's Business Practices Are Relevant and Likely to Lead to Admissible Information.

As an over-arching issue, Defendant would like the Court to restrict all discovery in this case and of the BBB records to Westgate owners. First, Defendant concedes that the BBB cannot actually tailor its production in this fashion. So it wants to apply an artificial filter to the discovery. Second, Defendant

11

does not distinguish between Westgate and other timeshare owners in its advertising and business practices, so why should discovery be so artificially limited? Defendant's silence on this issue is revealing and, in truth, an admission. Defendant knows, but will not say it, that its bad acts are the same for every customer regardless of timeshare developer.

Evidence that Defendant refused to refund a customer is just as relevant to the truth of Defendant's well publicized 100% money back guarantee whether it is a Wyndham owner, a Bluegreen owner, a Diamond Resorts™ owner, or a Westgate owner. It proves the ubiquitous advertising claim is false, period.

Because Defendant shrouds its business practices in secrecy, neither the BBB nor Westgate nor this Court have any tools to identify its reporters as Westgate owners, or Wyndham, Bluegreen or Diamond Resorts™ owners. Not intending to be tedious, this is ***Defendant's*** way and it comes with consequences. The business practices that affect all of Defendant's customers affect Westgate owners, and *vice versa.* At this point, Westgate cannot identify any witnesses from among its owners because: 1. it does not know which of its owners are Wesley customers; and 2. Westgate has extended the veil of secrecy to its list of Westgate owners so that neither Westgate nor its lawyers can develop trial witnesses and evidence. The BBB is a source of public, non-confidential and relevant information, providing both trial witnesses and trial evidence, unshrouded by Defendant's veil of secrecy.

Remember also, Defendant requires each customer – not just Westgate owners but every timeshare owner – sign a punitive non-disclosure agreement under pain of forfeiture of the customer's fees and denial of service. We need look no further than the news reports of four years ago to see the intimidating effect of such agreements on possible witnesses. These people who reported to the BBB were, while very possibly trepidatious, not dissuaded. They "breached" the non-disclosure and reported the facts. Westgate cannot predict if there will be any others until the veil of secrecy is lifted. But there is not the BBB reporters and what they have to say is relevant.

Defendant's suggests the BBB provide a list of reporters to the parties to, supposedly, identify Westgate owners. As we have said, the distinction amongst owners of different timeshare developers is fallacious. But regardless, Defendant itself has made what it proposes impossible. Defendant will not permit the names of Westgate owners who are its customers to be revealed to Westgate, whose customers these people are already. Westgate has, likely, more than 500,000 owners. Westgate, not its lawyers, know who its customers are. This proposal is stillborn.

**C. Responses to Objections to Individual Requests in the Subpoena**

Westgate responds to Defendant's individual issues below.

1. **Customer complaints regarding:**

    a. **Wesley's advertising**
    b. **The cost of and fees for Wesley's services**
    c. **Wesley's timeshare cancellation process**
    d. **Wesley's claim that it can get a timeshare owner out of his/her contract**
    e. **Wesley's guaranteed timeshare cancellation**
    f. **Wesley's 100% money back guarantee**
    g. **Wesley's business methods and practices**
    h. **Promises that Wesley did not keep and/or services that Wesley did not provide**
    i. **Wesley's failure to meet the expectations of the customer.**

At the outset, while Defendant lays out issues with the scope of this request, it is important to note that all customer complaints for the past three years are already posted online for public review. Westgate is entitled to authenticated copies of the documents posted online and the identification of potential witnesses that will be revealed with unredacted copies of the complaints. The only information Westgate seeks with respect to customer complaints over the past three years is the identity of the complainants and other information redacted by the BBB online. Some of the redactions appear to be the names of Defendant's employees who worked with the complainant – individuals who could be witnesses in this case.

13

Substantively, Defendant does not contest the propriety of the majority of this request. It appears that Defendant just wants to reword it unnecessarily. Defendant posits its own version of the request, which includes Westgate's requests at a and d verbatim. Defendant's proposed c is a combination of Westgate's e and f. Westgate's request h is reworded as "failure to provide the timeshare cancellation services it claimed it would provide," which essentially is the same thing.

Defendant takes issue with Westgate's request for complaints regarding Defendant's costs and fees. This is an appropriate request. Westgate alleges, "Wesley is engaged in a timeshare cancellation scheme with no legitimate legal foundation designed to induce existing Westgate owners to breach their Purchase Agreements with, and related obligations to, Westgate in order to steer Westgate owners to instead pay large, upfront sums to Wesley for its pecuniary gain." Compl. at ¶ 36. The Complaint also states, "Wesley misleads the owner into believing Wesley is gathering evidence to support a strategy that will allow the owner to legally cancel or terminate his or her timeshare interest, so that it appears that Wesley is earning its exorbitant fees." *Id.* at ¶ 47. Customer complaints regarding Wesley's costs and fees are relevant to these claims in the Complaint. Moreover, customer complaints regarding costs and fees are most likely related to claims that the customer was charged costs and fees for something less than or different from what was promised. That would constitute false advertising and is the basis for the claims in this case.

Defendant also takes issue with Westgate's request for complaints regarding Defendant's timeshare cancellation process or business methods and practices. While perhaps overlapping, these requests are designed to identify the business practices Defendant conceals from timeshare developers as part of its modus operandi. Westgate is unable to be more specific because Defendant has purposely hidden its conduct from Westgate and all other timeshare developers. Regardless, discovery is not limited to the facts included in the pleadings. *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). Discovery is designed to "define and clarify the issues." *Id.*

Complaints regarding Defendant's timeshare cancellation process, and business methods or practices will provide information regarding Defendant's conduct that is at the heart of this matter.

2. **Correspondence with Defendant regarding customer complaints identified in response to request 1.**

Defendant's objection to this request is based on the objection to request 1. Accordingly, Westgate incorporates its response regarding the objection to request 1.

3. **Responses exchanged by Defendant and customers regarding customer complaints identified in response to request 1.**

Defendant's objection to this request is based on the objection to request 1. Accordingly, Westgate incorporates its response regarding the objection to request 1.

4. **Customer reviews regarding Defendant.**

As noted above, the BBB collects customer reviews, good and bad, about businesses. What independent, voluntarily self-reporting customers say about Defendant is relevant to the claims in this case that Defendant falsely advertises its services and employs misleading and deceptive trade practices. Defendant touts positive reviews and testimonials on its website and social media accounts. For some period of time, Defendant also included its BBB accreditation on its advertisement, thereby directing prospective customers to the BBB site to confirm its trustworthiness. Surely, Defendant will claim that its advertisements are truthful and that it provides satisfactory services to its customers. It may even solicit testimony from satisfied customers in its defense. If Defendant will stipulate that it will not rely on any customer testimony regarding the veracity of its claims, then Westgate will limit its request to negative reviews. Otherwise, at this stage in discovery, all reviews are relevant and likely to lead to admissible evidence. Westgate is entitled to know the identity of customers who submitted reviews to the BBB in order to conduct its own independent investigation into the relationship between the parties.

### 5. Documents related to the revocation of Defendant's accreditation in BBB on November 20, 2019.

Defendant chose to apply for accreditation with the BBB and chose to include that accreditation in its advertising. Westgate maintains that all of Defendant's advertising is false and misleading. The facts surrounding Defendant's accreditation with the BBB and the revocation of that accreditation are relevant to the claims alleged by Westgate.

As detailed above, the BBB applies eight standards in its accreditation criteria, five of which are relevant to Westgate's allegations: 2. Advertise Honestly; 3. Tell the Truth; 4. Be Transparent; 5. Honor Promises; 6. Be Responsive. *See* Standards, https://www.bbb.org/bbb-accreditation-standards (last viewed on May 13, 2020). To the extent BBB has evidence that Defendant did not meet those standards, that evidence is relevant to Westgate's claims that Defendant falsely advertises its services and engages in unfair and deceptive business practices.

Defendant argues that this request is overly broad because it seeks documents "related to" the revocation of Defendant's accreditation. However, in this context, the use of "related to" is proper because it modifies a sufficiently specific event, i.e. the documents regarding the revocation of Defendant's accreditation. *See Cardenas v. Dorel Juvenile Group, Inc.*, 230 F.R.D. 611, 623 (D. Kan. 2005) (recognizing that the term "relating to" may be overly broad on its face when used with a general category or broad range of documents, but appropriate when it modifies as sufficiently specific type of information, document or event). Therefore, the request seeks relevant information and is not overly broad.

### 6. Documents related to BBB's accreditation of Defendant prior to November 20, 2019.

Once again, the process for BBB accreditation is voluntary and initiated by the business that desires the accreditation. BBB has standards the business must demonstrate and maintain in order to obtain accreditation. Defendant applied and was evaluated by BBB to obtain the

16

accreditation. Defendant chose to do this; neither the BBB nor any timeshare developer made it do so. Defendant then advertised the accreditation, presumably to increase its credibility in the marketplace. To the extent that Defendant's application was false or misleading at the time it was submitted, allowing Defendant to obtain the accreditation based on false information, that is relevant to Westgate's claims for false advertising. The fact that the BBB revoked the accreditation signifies that it determined Defendant no longer met its accreditation standards. The interplay between the decision to provide the accreditation and then revoke it will likely reveal information that is relevant to this case.

       **7.**    **Documents submitted by Defendant in connection with its application for BBB membership.**

Defendant knows what it submitted to obtain membership in the BBB. Yet its motion does not include any specific information regarding what is contained in those materials that might merit protection from discovery. Defendant voluntarily sought membership in the BBB and touted its membership and accreditation, thereby promoting customers' reliance on the information provided by BBB. All of the information submitted to the BBB in order to show that Defendant meets BBB standards is relevant to Westgate's claims that Defendant has built a business based on false and misleading advertisements and deceptive and unfair trade practices.

       **8.**    **Documents submitted by Defendant in connection with its application for BBB accreditation.**

Similar to the request above, Defendant knows what it submitted to obtain accreditation with the BBB. Yet its motion does not include any specific information regarding what is contained in those materials that might merit the Court's protection from discovery. Defendant voluntarily sought accreditation by the BBB and advertised its accreditation, thereby promoting customers' reliance on the information provided by BBB. All of the information submitted to the BBB in order to show that Defendant meets BBB standards is relevant to Westgate's claims that Defendant has

17

built a business based on false and misleading advertisements and deceptive and unfair trade practices.

      **9.    Documents related to BBB's revocation of Defendant's accreditation in BBB at any time prior to November 20, 2019.**

This request is intended to capture documents related to any instance when the BBB revoked Defendant's accreditation, other than in November 20, 2019, if any. Any prior revocations of BBB accreditation are relevant for the same reasons the most recent revocation is relevant. BBB's determination that Defendant did not meet its standards may be evidence that Defendant is falsely advertising its business or engaging in misleading or deceptive trade practices. In addition, if BBB previously revoked an accreditation and Defendant continued to advertise that it was accredited, that would constitute false advertising.

      **D. Documents Submitted to the BBB Should Not Require Confidential Treatment.**

Without authority, Defendant requests the extraordinary relief that information and documents that has been displayed in the public domain and which even the BBB disclaims confidentiality magically be deemed confidential and, more so, attorneys' eyes only confidential. No process is needed for this. When a non-party disclaims the possible confidentiality of its own mostly publicly disclosed documents, no party can honestly claim them as confidential. BBB, under ¶ 3 of the Confidentiality Agreement, had a chance to do so. It did not. That ends the debate.

The BBB makes it clear that the information it obtains is for the benefit of the public. Defendant, having been told that the BBB operates in the public domain, cannot have any legitimate expectation of privacy with respect anything it submitted to the BBB for its accreditation – a process Defendant chose to pursue – or in response to a customer report. BBB complaints and reviews are submitted for the very purpose of publication. Post hoc confidentiality is absurd.

Finally the Motion fails the test of the Court's Standing Order. Rather than provide specificity,

it presents no more than "generalized concerns, conclusory statements, and unsupported contentions." Standing Order Regarding Confidential Information, at p. 5.

Defendant's overreaching blanket request underscores what is wrong with this Motion for Protective Order. Defendant has not said a single word about: annoyance, embarrassment, oppression, or undue burden or expense, the customary hallmarks of a protective order. At its heart, this motion is designed for one thing only: to prevent Westgate form identifying witnesses who will say bad things about Defendant. Note also, other than reserving legitimate claims of attorney-client privilege, the BBB does not complain in any substantive way about this subpoena. *See* Letter from W. Adams to O. Vieira, May 19, 2020 attached hereto as Exhibit A. The BBB was prepared today to produce the documents, but Westgate told them to await disposition of this Motion.

### **CONCLUSION:**

Defendant's Motion for Protective Order provides no good reason to block discovery specifically about Defendant from an independent non-party who is not only not complaining, but ready to comply. The only prejudice Defendant is facing is that the BBB discovery will prove one or more of Westgate's claims against Defendant. And that has never been "prejudice" under any subsection of Rule 26.

GREENSPOON MARDER LLP

*/s/ Olga M. Vieira*
RICHARD W. EPSTEIN (FL Bar No. 229091)
richard.epstein@gmlaw.com
JEFFREY A. BACKMAN (FL Bar No. 662501)
jeffrey.backman@gmlaw.com
OLGA M. VIEIRA (FL Bar No. 029783)
olga.vieira@gmlaw.com
200 E. Broward Blvd., Suite 1800
Fort Lauderdale, FL 33301
Telephone: 954.491.1120
Facsimile: 954.343.6958

*Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 20, 2020, I electronically filed the foregoing via transmission of Notice of Electronic Filing generated by CM/ECF, which will forward copies of the same to all counsel of record.

/s/ *Olga M. Vieira*
OLGA M. VIEIRA